## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF OHIO
## AT DAYTON DIVISION

IN RE:

**NATHANIEL C BENN**
**CHERYL L COKLEY-BENN**

**DEBTOR**

IN PROCEEDINGS UNDER CHAPTER 7

CASE NO: 17-30016

JUDGE: GUY R. HUMPHREY

## MOTION OF DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR AMERIQUEST MORTGAGE SECURITIES INC., ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-R8 FOR RELIEF FROM STAY FOR REAL PROPERTY LOCATED AT 3762 Judy Lane, Dayton, OH 45405

Deutsche Bank National Trust Company, as Trustee for Ameriquest Mortgage Securities Inc., Asset-Backed Pass-Through Certificates, Series 2005-R8 (the "Creditor") in this proceeding under Chapter 7 of the Bankruptcy Code, and pursuant to 11 U.S.C. §362(d) of the Bankruptcy Code, Rules 4001, 9013 and 9014 of the Bankruptcy Rules and Local Bankruptcy Rule 4001-1, respectfully moves this Court for relief from the automatic stay imposed by 11 U.S.C. §362(a) in order to proceed with a state court proceeding to foreclose on the property located at 3762 Judy Lane, Dayton, OH 45405. The grounds upon which this Motion is made are more fully set forth in the attached Memorandum in Support.

## MEMORANDUM IN SUPPORT

1.    The Court has jurisdiction over this matter under 28 U.S.C. §§157 and 1334. This is a core proceeding under 28 U.S.C. §157(b)(2). The venue of this case and this Motion is proper under 28 U.S.C. §§1408 and 1409.

2.    On June 24, 2005, Nathaniel C Benn and Cheryl L Cokley-Benn (collectively "Debtor") obtained a loan from Ameriquest Mortgage Company, in the amount of $225,000.00.

Such loan was evidenced by a Promissory Note dated June 24, 2005 (the "Note"), a copy

of which is attached as Exhibit A.

3.     To secure payment of the Note and performance of the other terms contained in it, the

Debtor executed a Mortgage dated June 24, 2005 (the "Mortgage").  The Mortgage

granted a lien on the real property (the "Property") owned by the Debtor Cheryl L

Cokley-Benn, located at 3762 Judy Lane, Dayton, OH 45405 and more fully described in

the Mortgage.

4.     The lien created by the Mortgage was duly perfected by the recording of the Mortgage in

the office of the Montgomery County Recorder on July 11, 2005.  A copy of the

Mortgage is attached as Exhibit B.  The lien is the first lien on the property.

5.     The Note and Mortgage are currently held by Deutsche Bank National Trust Company, as

Trustee for Ameriquest Mortgage Securities Inc., Asset-Backed Pass-Through

Certificates, Series 2005-R8.

6.     The value of the Property is $117,900.00, per Montgomery County Auditor.

7.     As of March 6, 2017, there is currently due and owing on the Note, the outstanding

principal balance of $224,183.75, plus interest accruing thereon at the rate of 2% per

annum from May 1, 2016.

8.     Other parties known to have an interest in the Property are as follows:

        a.   Montgomery County Treasurer, for tax purposes.

9.     The Creditor is entitled to relief from the automatic stay under 11 U.S.C. § 362(d)(1)

and/or 362(d)(2) for these reason(s):

        a.      Debtor has failed to provide adequate protection for the lien held by the Creditor
                for the reasons set forth below.
        b.      Per the Note and Mortgage, payments are applied to the last month due.  Based
                upon the foregoing, Debtor has failed to make periodic payments to Creditor since

June 1, 2016, which unpaid payments are in the aggregate amount of $13,472.64 through March 6, 2017.

c.    Since the Bankruptcy was filed, Debtor should have made 2 post-petition payments but has only made 0.  Therefore, the loan is delinquent 10 payments.

10.    Creditor has completed the worksheet attached as Exhibit E.

11.    This Motion conforms to the standard form adopted in this District except as follows:

Clarification of language in Paragraph 3.

WHEREFORE, Creditor prays for an Order from the Court granting Creditor relief from the automatic stay of 11 U.S.C. §362 of the Bankruptcy Code to permit Creditor to proceed under law and for such other and further relief to which the Creditor may be entitled.

Respectfully Submitted,

/s/ Chris E. Manolis
Shapiro, Van Ess, Phillips & Barragate, LLP
Chris E. Manolis (0076197)
4805 Montgomery Road, Suite 320
Norwood, OH 45212
Phone:  (513) 396-8100
Fax:  (847) 627-8805
Email:  cmanolis@logs.com

**"Attached are redacted copies of any documents that support the claim, such as promissory notes, purchase order, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements in support of right to seek a lift of the automatic stay and foreclose if necessary."**

## CERTIFICATE OF SERVICE
## AND NOTICE OF REQUEST FOR RELIEF FROM STAY

      The undersigned certifies that a copy of the foregoing Motion for Relief from Stay was served this date, via email notification and/or regular U.S. mail, postage prepaid, on the parties whose names and addresses are listed below as and for NOTICE that the attached request for relief would be filed.  All parties are hereby NOTIFIED that a written memorandum in opposition along with a request for a hearing must be filed with the Court and served on the undersigned within twenty-one (21) days from the date of service of this Motion.  If no such memorandum in opposition is filed within that time period, the relief sought in the Motion may be granted.  Pursuant to Local Rule 9021-1, the undersigned will present to the Court a proposed Order granting the relief sought if, within twenty-five (25) days after this date, no such written memorandum in opposition has been filed with the Court.

Names and addresses of parties served:

**Served by Regular U.S. Mail**

Nathaniel C Benn
3762 Judy Lane
Dayton, OH 45405

Cheryl L Cokley-Benn
3762 Judy Lane
Dayton, OH 45405

**Electronic Mail Notice List**

Richard P. Arthur
1634 South Smithville Road
Dayton, OH 45410

Paul Spaeth
7925 Paragon Road, Suite 101
Dayton, OH 45459

Asst. US Trustee (Dayton)
Office of the US Trustee
170 North High Street, Suite 200
Columbus, OH 43215

DATED: March 28, 2017

Respectfully Submitted,

/s/ Chris E. Manolis
Shapiro, Van Ess, Phillips & Barragate, LLP
Chris E. Manolis (0076197)
4805 Montgomery Road, Suite 320
Norwood, OH 45212
Phone:  (513) 396-8100
Fax:  (847) 627-8805
Email:  cmanolis@logs.com

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF OHIO
## DAYTON DIVISION

| | |
|---|---|
| **IN RE:** | **IN PROCEEDINGS UNDER CHAPTER 7** |
| **NATHANIEL C BENN** | **CASE NO: 17-30016** |
| **CHERYL L COKLEY-BENN** | |
| | **JUDGE: GUY R. HUMPHREY** |
| **Debtor** | |

---

## RELIEF FROM STAY/ADEQUATE PROTECTION
## EXHIBIT AND WORKSHEET – REAL ESTATE
## (For use as required by LBR 4001-1(a)(1))

---

Real property address which is the subject of this motion:
3762 Judy Lane
Dayton, OH 45405

**DEBT/VALUE REPRESENTATIONS:**

| | | |
|---|---|---|
| Total indebtedness of the debtor(s) as of March 6, 2017 (not to be relied upon as a payoff quotation) | $ | 232,500.98 |
| Movant's estimated market value of the real property | $ | 117,900.00 |
| Source of the estimated valuation   Montgomery County Auditor | | |

**STATEMENT OF ARREARAGE:**

| | | | |
|---|---|---|---|
| (1) As of petition filing date: | | $ | 12,550.46 |
| (2) Postpetition: | | $ | 2,725.52 |
| (3) Monthly payment amount: | | | |
| | Eight (8) payments at: | $ | 1,343.39 |
| | Two (2) payments at: | $ | 1,362.76 |
| (4) Date of Last Payment | April 29, 2016 | | |
| (5) Amount of Last Payment | | $ | 1,343.39 |

# of payments due postpetition          2     (through payment due 03/06/17)

# of payments received postpetition          0

# of payments in default postpetition          2

| | | |
|---|---|---|
| Total amount of postpetition payments currently in default: | $ | 2,725.52 |
| + Postpetition late charges | $ | |
| + Other charges | $ | |
| Motion for Relief Filing Fee | $ | |
| Interest | $ | |
| Property Inspection | $ | |
| ESCROW Advances | $ | |
| Corporate Advances | $ | |
| = Total Postpetition Arrearage | $ | 2,725.52 |

**OTHER LOAN INFORMATION:**

Date of the Loan          June 24, 2005

Current Interest Rate      2%

Money paid to and held by the mortgagee but not applied to the loan $0.00; if held in the form of checks, balance of such checks $0.00, and identity of holder of the checks n/a.

**REQUIRED ATTACHMENTS TO MOTION:**

(a) In a Chapter 13 case, a postpetition payment history.

(b) In all cases, copies of documents which indicate movant's interest in the subject property. For purposes of example only, a complete and legible copy of the promissory note or other debt instrument together with a complete and legible copy of the real estate mortgage should be attached. The mortgage should bear date stamps reflecting the recording date together with recording references reflecting the recordation of the mortgage with the appropriate county official. If the subject property is registered land, movant shall attach a copy of the registered land certificate or other documentation reflecting that the mortgage was memorialized as a lien on the registered land certificate.

This Exhibit and Worksheet was prepared by:

Respectfully Submitted,

/s/ Chris E. Manolis
Shapiro, Van Ess, Phillips & Barragate, LLP
Chris E. Manolis (0076197)
4805 Montgomery Road, Suite 320
Norwood, OH 45212
Phone:  (513) 396-8100
Fax:  (847) 627-8805
Email:  cmanolis@logs.com

# FIXED RATE NOTE

**THIS LOAN HAS A PREPAYMENT PENALTY PROVISION.**

June 24, 2005                          Orange                          CA
[Date]                                 [City]                          [State]

3762 Judy Lane, Dayton, OH  45405
[Property Address]

## 1.  BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 225,000.00  (this amount is called "principal"), plus interest, to the order of the Lender.  The Lender is     Ameriquest Mortgage Company .

I understand that the Lender may transfer this Note.  The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid.  I will pay interest at a yearly rate of  **8.250 %**.

The interest rate required by this Section 2 is the rate I will pay before and after any default described in Section 6(B) of this Note.

## 3.  PAYMENTS

**(A) Time and Place of Payments**

Beginning on September 1, 2005 and on the first day of every month thereafter through 08/01/2010, I will pay monthly payments of only the interest on the unpaid principal balance of the Note.  Thereafter, I will make my monthly payments of principal and interest on the first day of every month beginning on 09/01/2010 until I have paid all of the principal and interest and any other charges described below that I may owe under this note.  My monthly payments will be applied to interest before principal.  If, on August 1, 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at:  **505 City Parkway West, Suite 100,  Orange, CA 92868**

**(B) Amount of Monthly Payments**

My monthly payments will be in the amount of U.S. $ 1,546.88 for the first 60 months of this Note, and thereafter will be in the amount of U.S. $ 1,774.02.  This monthly payment may change if I make any partial prepayment as set forth in Section 4 of this Note.  The Note Holder will notify me prior to the date of any change in monthly payment.

## 4.  BORROWER'S RIGHT TO PREPAY

I may repay this Note at any time as provided for in this paragraph. If within the first  3.00  year(s), I prepay in any 12 month period an amount exceeding 20% of the original principal balance under this Note, I will pay a prepayment charge to Note Holder equal to one percent (1%) of the original principal amount of the mortgage.

## 5.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then; (i) any such loan charged shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 6.  BORROWER'S FAILURE TO PAY AS REQUIRED

**(A)  Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of  **fifteen**  calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be   **5.000 %** of my overdue payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

**(B)    Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)    Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed me.

Initials:

06/24/2005 2:35:51 PM

208-1OH (02/05)

**(D)    No Waiver by Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)    Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorney's fees.

**7.    GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8.    OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9.    WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10.  UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

   **Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if prohibited by federal law as of the date of this Security Instrument.

   If the Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.


WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED


_____(Seal)          _____(Seal)
Borrower:   Cheryl L Cokley Benn                Borrower:   Nathaniel C Benn


_____(Seal)          _____(Seal)
Borrower:                                       Borrower:

206-2OH (02/05)                                              06/24/2005 2:35:51 PM

PAY TO THE ORDER OF

WITHOUT RECOURSE
AMERIQUEST MORTGAGE COMPANY

BY: _____
ASEEM MITAL, PRESIDENT/C E O

BY: _____
KAREN CHRISTENSEN, C F O

$140.00 07/11/05 15:51:59
MORT-05-06678B  0016
Montgomery County
Judy Dodge Recorder

Return To:

**Ameriquest Mortgage Company**
**P.O. Box 11507,**
**Santa Ana, CA 92711**

M16

─────── [Space Above This Line For Recording Data] ───────

# MORTGAGE

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections
3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided
in Section 16.

**(A) "Security Instrument"** means this document, which is dated **June 24, 2005**
together with all Riders to this document.
**(B) "Borrower"** is **Cheryl L Cokley** ~~Kour and Nathaniel C Benn, Wife and~~
~~Husband X as Joint Tenants with Full Rights of Survivorship~~

Borrower is the mortgagor under this Security Instrument.
**(C) "Lender"** is **Ameriquest Mortgage Company**

Lender is a **Corporation**
organized and existing under the laws of **Delaware**

**OHIO**-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3036  1/01
**06/24/2005 2:35:51**

**AM6OH** (0311)
Page 1 of 15
VMP Mortgage Solutions (800)521-7291

Initials: _Clck_
NCB

Lender's address is **1100 Town and Country Road, Suite 200   Orange, CA 92868**

Lender is the mortgagee under this Security Instrument.

**(D) "Note"** means the promissory note signed by Borrower and dated **June 24, 2005**
The Note states that Borrower owes Lender **two hundred twenty-five thousand and 00/100**
Dollars
(U.S. $ **225,000.00**                ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **August 1, 2035**

**(E) "Property"** means the property that is described below under the heading "Transfer of Rights in the
Property."

**(F) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.

**(G) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

☐ Adjustable Rate Rider    ☐ Condominium Rider           ☐ Second Home Rider
☐ Balloon Rider            ☐ Planned Unit Development Rider   ☐ 1-4 Family Rider
☐ VA Rider                 ☐ Biweekly Payment Rider      ☐ Other(s) [specify]

**(H) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.

**(I) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.

**(J) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check,
draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument,
computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an
account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine
transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

**(K) "Escrow Items"** means those items that are described in Section 3.

**(L) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.

**(M) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on,
the Loan.

**(N) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

AM6OH (0311)                        Page 2 of 15                  Initials: _____         Form 3036  1/01

06/24/2005 2:35:51

**(O) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

**(P) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender the following described property located in the

|                County                | of |         MONTGOMERY          | : |
| [Type of Recording Jurisdiction] | | [Name of Recording Jurisdiction] | |

Legal Description Attached Hereto and Made a Part Hereof.

Parcel ID Number E20-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        which currently has the address of
3762 Judy Lane                                              [Street]
Dayton                                   [City], Ohio 45405        [Zip Code]
("Property Address"):

   TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

Initials: _ClcL_
NC.β

AM6OH (0311)                    Page 3 of 15                    Form 3036  1/01
06/24/2005 2:35:51

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

**1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any,

Initials: _____
NCB

06/24/2005  2:35:51

or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent

06/24/2005 2:35:51

the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be

06/24/2005 2:35:51

applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although

06/24/2005 2:35:51

Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

06/24/2005 2:35:51

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

06/24/2005 2:35:51

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless

Initials: _Clcb_
NCB

Form 3036  1/01

06/24/2005 2:35:51

Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

AM6OH (0311)                          Page 11 of 15           Initials: _Clel_        Form 3036  1/01
                                                                      _NC B_

06/24/2005 2:35:51

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

Initials: _CLcb_
_NCB_

06/24/2005 2:35:51

NON UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, costs of title evidence.**

**23. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall discharge this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**24. Certain Other Advances.** In addition to any other sum secured hereby, this Security Instrument shall also secure the unpaid principal balance of, plus accrued interest on, any amount of money loaned, advanced or paid by Lender to or for the account and benefit of Borrower, after this Security Instrument is delivered to and filed with the Recorder's Office, **MONTGOMERY**
County, Ohio, for recording. Lender may make such advances in order to pay any real estate taxes and assessments, insurance premiums plus all other costs and expenses incurred in connection with the operation, protection or preservation of the Property, including to cure Borrower's defaults by making any such payments which Borrower should have paid as provided in this Security Instrument, it being intended by this Section 24 to acknowledge, affirm and comply with the provision of Section 5301.233 of the Revised Code of Ohio.

06/24/2005 2:35:51

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____      X _Cheryl L. Cokley Benn_____ (Seal)
                                  **Cheryl L Cokley Benn**         -Borrower


_____      X _Nathaniel C Benn_____ (Seal)
                                  **Nathaniel C Benn**            -Borrower


_____ (Seal)       _____ (Seal)
                      -Borrower                              -Borrower


_____ (Seal)       _____ (Seal)
                      -Borrower                              -Borrower


_____ (Seal)       _____ (Seal)
                      -Borrower                              -Borrower

**STATE OF OHIO,** _Montgomery_ **County ss:**

On this _24_ day of _June 05_ , before me, a
Day                          Month/Year
Notary Public in and for said County and State, personally appeared

_Cheryl L. Cokley-Benn & Nathaniel C. Benn_

the individual(s) who executed the foregoing instrument and acknowledged that he/she/they did
examine and read the same and did sign the foregoing instrument, and that the same is
his/her/their free act and deed.

IN WITNESS WHEREOF, I have hereunto set my hand and official seal.

My Commission Expires: _05 05 09_



Amanda M. Miller, Notary Public
In and For the State of Ohio
My Commission Expires _____
                                          Notary Public

Prepared By:
Not Assigned
7887 Washington Village Drive, Suite #13, Dayton, OH 45459



400-15OH (4/02)                Page 15 of 15

06/24/2005 2:35:51 PM

EXHIBIT "A"

THE FOLLOWING REAL PROPERTY, SITUATED IN THE CITY OF DAYTON, TOWNSHIP OF
HARRISON, COUNTY OF MONTGOMERY AND THE STATE OF OHIO:

AND BEING LOT NUMBER SIXTEEN (16), ANNASONS PLAT, AS RECORDED IN PLAT BOOK
FF, PAGE 33 OF THE PLAT RECORDS OF MONTGOMERY COUNTY, OHIO.

TAX PARCEL NO: E20-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     272d
         AKA: 3762 JUDY LANE
              DAYTON, OH 45405
              CHERYL COKLEY

     ORDER# :200000731271



CRL L#: █████
Assignee L#: █████
Investor L#: █████
Custodian: 85
Effective Date: 02/11/2009
When Recorded Return To:
AMERICAN HOME MTG SERVICING
C/O NTC 2100 Alt. 19 North
Palm Harbor, FL 34683

## ASSIGNMENT OF MORTGAGE

FOR GOOD AND VALUABLE CONSIDERATION, the sufficiency of which is hereby acknowledged, the undersigned, CITI RESIDENTIAL LENDING INC., AS ATTORNEY-IN-FACT FOR AMERIQUEST MORTGAGE COMPANY, WHOSE ADDRESS IS 10801 E. 6TH STREET , RANCHO CUCAMONGA, CA 91730, (ASSIGNOR), by these presents does convey, grant, sell, assign, transfer and set over the described mortgage together with the certain note(s) described therein together with all interest secured thereby, all liens, and any rights due or to become due thereon to DEUTSCHE BANK NATIONAL TRUST COMPANY, AS TRUSTEE FOR, AMERIQUEST MORTGAGE SECURITIES INC. ASSET-BACKED PASS-THROUGH CERTIFICATES, SERIES 2005-R8, UNDER THE POOLING AND SERVICING AGREEMENT DATED SEPTEMBER 1, 2005, WHOSE ADDRESS IS 1761 EAST ST. ANDREW PLACE , SANTA ANA, CA 92705-4934, (ASSIGNEE)
Said mortgage executed by: CHERYL L. COKLEY (current owner) to AMERIQUEST MORTGAGE COMPANY and recorded in the record of mortgages Volume page and/or Instrument # 05-066788 in the office of the Recorder of MONTGOMERY, Ohio.

More particularly described as follows (if needed), to wit:
THE FOLLOWING REAL PROPERTY, SITUATED IN THE CITY OF DAYTON, TOWNSHIP OF HARRISON, COUNTY OF MONTGOMERY AND THE STATE OF OHIO: AND BEING LOT NUMBER SIXTEEN (16), ANNASONS PLAT, AS RECORDED IN PLAT BOOK FF, PAGE 33 OF THE PLAT RECORDS OF MONTGOMERY COUNTY, OHIO.

IN WITNESS WHEREOF, the undersigned has hereunto set its corporate hand by its proper officer THIS 20TH DAY OF JANUARY IN THE YEAR 2009
CITI RESIDENTIAL LENDING INC., AS ATTORNEY-IN-FACT FOR AMERIQUEST MORTGAGE COMPANY

BY:_____
    CRYSTAL MOORE  VICE PRESIDENT

STATE OF FLORIDA            COUNTY OF PINELLAS
Before me, the undersigned, a Notary Public in and for said County, personally appeared CRYSTAL MOORE of CITI RESIDENTIAL LENDING INC., AS ATTORNEY-IN-FACT FOR AMERIQUEST MORTGAGE COMPANY who as such officer for and on its behalf acknowledged the execution of the foregoing instrument. Witness my hand and Notary Seal THIS 20TH DAY OF JANUARY IN THE YEAR 2009

_____
BRYAN J. BLY        Notary Public
My commission expires: 07/01/2011

Prepared by: Jessica Fretwell/NTC,2100 Alt. 19 North, Palm Harbor, FL 34683 (800)346-9152



form5/FRMOH1

TRANSFER
07/04 pm   JULY 08, 2003
KARL L. KEITH, COUNTY AUDITOR
Conv/Tran #: 13211          $391.80

D-3ω

## GENERAL WARRANTY DEED

Josephine Taylor, unmarried  , the Grantor(s), for valuable consideration paid, grant(s) with general warranty covenants, to Cheryl L. Cokley, the Grantee(s), the following real property:

*ATTACHED HERETO AS EXHIBIT 'A'*

Subject to covenants, easements and restrictions of record, if any, and subject to real estate taxes and installments of assessments, if any, not delinquent on the date hereof, all of which the Grantee(s) assume(s) and agree(s) to pay.

Auditor's Parcel Number(s): E20-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

Prior instrument reference(s): microfiche 93-412 D06, Montgomery County, Ohio records.

Address of Property: 3762 Judy Lane, Dayton, OH  45405

Executed this 27th day of June, 2003.

*Josephine Taylor*
Josephine Taylor

**Instrument Number: 2003-00106926  Seq: 1**
File No:  0308046619DA

STATE OF Ohio

COUNTY OF Montgomery

The foregoing instrument was acknowledged before me this 27th day of June, 2003 by Josephine Taylor, unmarried .

_Sandra L. Yount_

Notary Public

This instrument prepared by:
Colloton & Cain
8044 Montgomery Road, Suite 470
Cincinnati, Ohio 45236

0308046619DA

**SANDRA L. YOUNT**
**Notary Public**
**In and for the State of Ohio**
**My Commission Expires**
**February 24, 2007**

**Order No: SO046619DA**
Reference No: 0308

## Exhibit "A"

Situated in the Township of Harrison, County of Montgomery and State of Ohio and being Lot
Numbered Sixteen (16), Annasons Plat, as recorded in Plat Book "FF", page 33 of the Plat Records of
Montgomery County, Ohio.

E20-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

5-764-47647-0000640-001-5-000-000-000-000

Case 3:17-bk-30016   Doc 21   Filed 03/28/17   Entered 03/28/17 12:47:15   Desc Main
Investor Loan # _____   Document   Page 30 of 35



# HOME AFFORDABLE MODIFICATION AGREEMENT
## (Step Two of Two-Step Documentation Process)

Borrower ("I"): [1]CHERYL L COKLEY BENN & NATHANIEL C BENN
Lender or Servicer ("Lender"): AMSI 2005-R8
Date of first lien mortgage, deed of trust, or security deed ("Mortgage") and Note ("Note"): 6/24/2005
Loan Number: 4001656539
Property Address ("Property"): 3762 JUDY LANE,DAYTON OH 45405

If my representations in Section 1 continue to be true in all material respects, then this Home Affordable
Modification Agreement ("Agreement") will, as set forth in Section 3, amend and supplement (1) the Mortgage
on the Property, and (2) the Note secured by the Mortgage. The Mortgage and Note together, as they may
previously have been amended, are referred to as the "Loan Documents." Capitalized terms used in this
Agreement and not defined have the meaning given to them in Loan Documents.

I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send me a
signed copy of this Agreement. This Agreement will not take effect unless the preconditions set forth in Section
2 have been satisfied.

1.   **My Representations**. I certify, represent to Lender, and agree:

    A. I am experiencing a financial hardship, and as a result, (i) I am in default under the Loan
       Documents, and (ii) I do not have sufficient income or access to sufficient liquid assets to make
       the monthly mortgage payments now or in the near future;
    B. I live in the Property as my principal residence, and the Property has not been condemned;
    C. There has been no change in the ownership of the Property since I signed the Loan Documents;
    D. I have provided documentation for **all** income that I receive (and I understand that I am not
       required to disclose child support or alimony unless I chose to rely on such income when
       requesting to qualify for the Home Affordable Modification program ("Program"));
    E. Under penalty of perjury, all documents and information I have provided to Lender in connection
       with this Agreement, including the documents and information regarding my eligibility for the
       Program, are true and correct;
    F. If Lender requires me to obtain credit counseling in connection with the Program, I will do so; and
    G. I have made or will make all payments required under a Trial Period Plan or Loan Workout Plan.

2.   **Acknowledgements and Preconditions to Modification.**   I understand and acknowledge that:

    A. If prior to the Modification Effective Date as set forth in Section 3 the Lender determines that any
       of my representations in Section 1 are no longer true and correct, the Loan Documents will not be
       modified and this Agreement will terminate. In that event, the Lender will have all of the rights and
       remedies provided by the Loan Documents; and

    B. I understand that the Loan Documents will not be modified unless and until (i) I receive from the
       Lender a copy of this Agreement signed by the Lender, and (ii) the Modification Effective Date (as
       defined in Section 3) has occurred. I further understand and agree that the Lender will not be
       obligated or bound to make any modification of the Loan Documents if I fail to meet any one of the
       requirements under this Agreement.

---

[1] If more than one Borrower or Mortgagor is executing this document, each is referred to as "I." For purposes of this document words
signifying the singular (such as "I") shall include the plural (such as "we") and vice versa where appropriate.

**MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT - Single Family - Fannie Mae/Freddie Mac UNIFORM
INSTRUMENT**
                                                             Form 3157 3/09 (rev. 8/09) *(page 1 of 5 pages)*

3.  **The Modification**. If my representations in Section 1 continue to be true in all material respects and all preconditions to the modification set forth in Section 2 have been met, the Loan Documents will automatically become modified on 1/1/2010 (the "Modification Effective Date") and all unpaid late charges that remain unpaid will be waived. I understand that if I have failed to make any payments as a precondition to this modification under a workout plan or trial period plan, this modification will not take effect. The first modified payment will be due on 1/1/2010.

A.  The new Maturity Date will be: 8/1/2035.

B.  The modified principal balance of my Note will include all amounts and arrearages that will be past due as of the Modification Effective Date (including unpaid and deferred interest, fees, escrow advances and other costs, but excluding unpaid late charges, collectively, "Unpaid Amount") less any amounts paid to the Lender but not previously credited to my Loan. The new principal balance of my Note will be $248,723.24 (the "New Principal Balance"). I understand that by agreeing to add the Unpaid Amounts to the outstanding principal balance, the added Unpaid Amounts accrue interest based on the interest rate in effect under this Agreement. I also understand that this means interest will now accrue on the unpaid Interest that is added to the outstanding principal balance, which would not happen without this Agreement.

C.  Interest at the rate of 2% will begin to accrue on the New Principal Balance as of 12/1/2009, and the first new monthly payment on the New Principal Balance will be due on 1/1/2010. My payment schedule for the modified Loan is as follows:

| Years | Interest Rate | Interest Rate Change Date | Monthly Principal and Interest Payment Amount | Estimated Monthly Escrow Payment Amount* | Total Monthly Payment* | Payment Begins On | Number of Monthly Payments |
|-------|---------------|---------------------------|-----------------------------------------------|------------------------------------------|------------------------|-------------------|----------------------------|
| 1-5 | 2% | 12/1/2009 | $1,003.50 | $473.55 | $1,477.05 | 1/1/2010 | 60 |
| 6 | 3% | 12/1/2014 | $1,107.73 | May adjust periodically | May adjust periodically | 1/1/2015 | 12 |
| 7 | 4% | 12/1/2015 | $1,213.45 | May adjust periodically | May adjust periodically | 1/1/2016 | 12 |
| 8 | 5% | 12/1/2016 | $1,319.98 | May adjust periodically | May adjust periodically | 1/1/2017 | 12 |
| 9 | 5.03% | 12/1/2017 | $1,323.12 | May adjust periodically | May adjust periodically | 1/1/2018 | 12 |
| 10-26 | 5.03% | 12/1/2018 | $1,323.12 | May adjust periodically | May adjust periodically | 1/1/2019 | 200 |
| 26 | N/A% | N/A | $15,453.00 | N/A | $15,453.00 | 8/1/2035 | 1 |

5-764-47647-0000640-001-7-000-000-000-000

*The escrow payments may be adjusted periodically in accordance with applicable law and therefore my total monthly payment may change accordingly.

The above terms in this Section 3.C. shall supersede any provisions to the contrary in the Loan Documents, including but not limited to, provisions for an adjustable or step interest rate.

I understand that, if I have a pay option adjustable rate mortgage loan, upon modification, the minimum monthly payment option, the interest-only or any other payment options will no longer be offered and that the monthly payments described in the above payment schedule for my modified loan will be the minimum payment that will be due each month for the remaining term of the loan. My modified loan will not have a negative amortization feature that would allow me to pay less than the interest due resulting in any unpaid interest to be added to the outstanding principal balance.

D.  I will be in default if I do not comply with the terms of the Loan Documents, as modified by this Agreement.

E.  If a default rate of interest is permitted under the Loan Documents, then in the event of default under the Loan Documents, as amended, the interest that will be due will be the rate set forth in Section 3.C.

4.      **Additional Agreements**.  I agree to the following:

A.  That all persons who signed the Loan Documents or their authorized representative(s) have signed this Agreement, unless (i) a borrower or co-borrower is deceased; (ii) the borrower and co-borrower are divorced and the property has been transferred to one spouse in the divorce decree, the spouse who no longer has an interest in the property need not sign this Agreement (although the non-signing spouse may continue to be held liable for the obligation under the Loan Documents); or (iii) the Lender has waived this requirement in writing.

B.  That this Agreement shall supersede the terms of any modification, forbearance, Trial Period Plan, or Workout Plan that I previously entered into with Lender.

C.  To comply, except to the extent that they are modified by this Agreement, with all covenants, agreements, and requirements of Loan Documents including my agreement to make all payments of taxes, insurance premiums, assessments, Escrow Items, impounds, and all other payments, the amount of which may change periodically over the term of my Loan.

D.  **Funds for Escrow Items.**  I will pay to Lender on the day payments are due under the Loan Documents as amended by this Agreement, until the Loan is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over the Mortgage as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under the Loan Documents;  (d) mortgage insurance premiums, if any, or any sums payable to Lender in lieu of the payment of mortgage insurance premiums in accordance with the Loan Documents; and (e) any community association dues, fees, and assessments that Lender requires to be escrowed. These items are called "Escrow Items."  I shall promptly furnish to Lender all notices of amounts to be paid under this Section 4.D.  I shall pay Lender the Funds for Escrow Items unless Lender waives my obligation to pay the Funds for any or all Escrow Items.  Lender may waive my obligation to pay to Lender Funds for any or all Escrow Items at any time.  Any such waiver may only be in writing.  In the event of such waiver, I shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within

5-764-47647-0000640-001-8-000-000-000-000

such time period as Lender may require. My obligation to make such payments and to provide receipts shall, for all purposes, be deemed to be a covenant and agreement contained in the Loan Documents, as the phrase "covenant and agreement" is used in the Loan Documents. If I am obligated to pay Escrow Items directly, pursuant to a waiver, and I fail to pay the amount due for an Escrow Item, Lender may exercise its rights under the Loan Documents and this Agreement and pay such amount, and I shall then be obligated to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with the Loan Documents, and, upon such revocation, I shall pay to Lender all Funds, and in such amounts, that are then required under this Section 4.D.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under the Real Estate Settlement Procedures Act ("RESPA"), and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items, or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured), or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge me for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays me interest on the Funds and applicable law permits Lender to make such a charge. Unless an agreement is made in writing or applicable law requires interest to be paid on the Funds, Lender shall not be required to pay me any interest or earnings on the Funds. Lender and I can agree in writing, however, that interest shall be paid on the Funds. Lender shall provide me, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to me for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify me as required by RESPA, and I shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by the Loan Documents, Lender shall promptly refund to me any Funds held by Lender.

E.  That the Loan Documents are composed of duly valid, binding agreements, enforceable in accordance with their terms and are hereby reaffirmed.

F.  That all terms and provisions of the Loan Documents, except as expressly modified by this Agreement, remain in full force and effect; nothing in this Agreement shall be understood or construed to be a satisfaction or release in whole or in part of the obligations contained in the Loan Documents; and that except as otherwise specifically provided in, and as expressly modified by, this Agreement, the Lender and I will be bound by, and will comply with, all of the terms and conditions of the Loan Documents.

G.  That, as of the Modification Effective Date, notwithstanding any other provision of the Loan Documents, I agree as follows:  If all or any part of the Property or any interest in it is sold or transferred without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by the Mortgage. However, Lender shall not exercise this option if state or federal law, rules or regulations prohibit the exercise of such option as of the date of such sale or transfer. If Lender exercises this option, Lender shall give me notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which I must pay all sums secured by the Mortgage. If I fail to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by the Mortgage without further notice or demand on me.

H.  That, as of the Modification Effective Date, I understand that the Lender will only allow the transfer and assumption of the Loan, including this Agreement, to a transferee of my property as permitted under the Garn St. Germain Act, 12 U.S.C. Section 1701j-3. A buyer or transferee of the Property will not be permitted, under any other circumstance, to assume the Loan. Except as noted herein, this Agreement may not be assigned to, or assumed by, a buyer or transferee of the Property.

I.  That, as of the Modification Effective Date, any provision in the Note, as amended, for the assessment of a penalty for full or partial prepayment of the Note must be waived with respect to any borrower "pay for performance" principal reduction payments that are applied to the Loan.

J.   That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

K.   That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Plan if an error is detected after execution of this Agreement.  I understand that a corrected Agreement will be provided to me and this Agreement will be void and of no legal effect upon notice of such error.  If I elect not to sign any such corrected Agreement, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification program.

L.   Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS.  In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan.

M.   That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosure of my personal information and the terms of the Trial Period Plan and this Modification Agreement by Lender to (a) the U.S. Department of the Treasury, (b) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (c) any investor, insurer, guarantor or servicer that owns, insures, guarantees, or services my first lien or subordinate lien (if applicable) mortgage loan(s); (d) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (e) any HUD certified housing counselor.

N.   I agree that if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial, and deliver to the Lender any documentation the Lender deems necessary.  If the original promissory note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the original note.  All documents the Lender requests of me under this Section 4.N. shall be referred to as "Documents."  I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

In Witness Whereof, the Lender and I have executed this Agreement.

AMSI 2005-R8

By: _Mary Dee Kirkland_

_03/12/10_
Date

_Cheryl Lu Cokley-Benn_ (Seal)
CHERYL L COKLEY, BENN
_03/12/10_
Date

_Nathaniel C Benn_ (Seal)
NATHANIEL C BENN
_03-12-10_
Date

_____[Space Below This Line For Acknowledgement]_____

MARY DEE KIRKLAND, Notary Public
In and for the State of Ohio
My Commission Expires April 28, 2010

**MULTISTATE HOME AFFORDABLE MODIFICATION AGREEMENT - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT**
Form 3157 3/09 (rev. 8/09) *(page 5 of 5 pages)*

J.   That, I will cooperate fully with Lender in obtaining any title endorsement(s), or similar title insurance product(s), and/or subordination agreement(s) that are necessary or required by the Lender's procedures to ensure that the modified mortgage loan is in first lien position and/or is fully enforceable upon modification and that if, under any circumstance and not withstanding anything else to the contrary in this Agreement, the Lender does not receive such title endorsement(s), title insurance product(s) and/or subordination agreement(s), then the terms of this Agreement will not become effective on the Modification Effective Date and the Agreement will be null and void.

K.   That I will execute such other documents as may be reasonably necessary to either (i) consummate the terms and conditions of this Agreement; or (ii) correct the terms and conditions of this Plan if an error is detected after execution of this Agreement. I understand that a corrected Agreement will be provided to me and this Agreement will be void and of no legal effect upon notice of such error. If I elect not to sign any such corrected Agreement, the terms of the original Loan Documents shall continue in full force and effect, such terms will not be modified by this Agreement, and I will not be eligible for a modification under the Home Affordable Modification program.

L.   Mortgage Electronic Registration Systems, Inc. ("MERS") is a separate corporation organized and existing under the laws of Delaware and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, (888) 679-MERS. In cases where the loan has been registered with MERS who has only legal title to the interests granted by the borrower in the mortgage and who is acting solely as nominee for Lender and Lender's successors and assigns, MERS has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling the mortgage loan.

M.   That Lender will collect and record personal information, including, but not limited to, my name, address, telephone number, social security number, credit score, income, payment history, government monitoring information, and information about account balances and activity. In addition, I understand and consent to the disclosure of my personal information and the terms of the Trial Period Plan and this Modification Agreement by Lender to (a) the U.S. Department of the Treasury, (b) Fannie Mae and Freddie Mac in connection with their responsibilities under the Home Affordability and Stability Plan; (c) any investor, insurer, guarantor or servicer that owns, insures, guarantees, or services my first lien or subordinate lien (if applicable) mortgage loan(s); (d) companies that perform support services for the Home Affordable Modification Program and the Second Lien Modification Program; and (e) any HUD certified housing counselor.

N.   I agree that if any document related to the Loan Documents and/or this Agreement is lost, misplaced, misstated, inaccurately reflects the true and correct terms and conditions of the loan as modified, or is otherwise missing, I will comply with the Lender's request to execute, acknowledge, initial, and deliver to the Lender any documentation the Lender deems necessary. If the original promissory note is replaced, the Lender hereby indemnifies me against any loss associated with a demand on the original note. All documents the Lender requests of me under this Section 4.N. shall be referred to as "Documents." I agree to deliver the Documents within ten (10) days after I receive the Lender's written request for such replacement.

In Witness Whereof, the Lender and I have executed this Agreement.

_____          _____ (Seal)
AMSI 2005-R8                                  CHERYL L COKLEY BENN

By: _Courtney Parrish_                        _____
                                             Date
       _3. 16. 18_
_____          _____ (Seal)
Date                                         NATHANIEL C BENN

                                             _____
                                             Date

_____[Space Below This Line For Acknowledgement]_____